IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:09-CR-475-WSD-CCH-3 |
| JOSE   ROBERTO   SALAZAR- | : | |
| ORELLANA | : | |

## REPORT AND RECOMMENDATION

Defendant Jose Roberto Salazar-Orellana ("Defendant") is charged in the indictment with three counts of committing a robbery of a business in interstate commerce through the threat or use of violence, and three counts of using and carrying a firearm during and in relation to a crime of violence, all based on three incidents of armed robberies that occurred on or about March 15, 2009, March 17, 2009, and March 23, 2009. This action is before the Court on Defendant's Motion to Suppress Statements [45] and Motion to Suppress Evidence Obtained from April 24, 2009 Search and Seizure [47] ("Motion to Suppress Evidence").

The Court held an evidentiary hearing on Defendant's Motion to Suppress Statements, Motion to Suppress Evidence, and other pending motions on February 3, 2010, and a transcript of that hearing [81] was filed on February 17, 2010. Thereafter, Defendant filed a post-hearing brief in support of his Motion to Suppress Evidence

and Motion to Suppress Evidence [84] on March 31, 2010, the Government filed a response brief [92] to the Motion to Suppress Evidence and Motion to Dismiss on May 1, 2010.  Defendant had until May 10, 2010, in which to file a reply brief but chose not to do so.  Thus, the motions were submitted to the undersigned for resolution on May 11, 2010.

Having heard the evidence and having reviewed the transcript of the evidentiary hearings and the briefs of the parties, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [45] be **GRANTED** and Defendant's Motion to Suppress Evidence [47] be **DENIED**.

## FINDINGS OF FACT

1.  Officer Benny McCollough of the Gwinnett County Police Department ("GCPD") testified that, in March of 2009, he was a robbery detective. Transcript of February 3, 2010 Hearing ("T.") [81] at 153.

2.  While investigating a series of armed robberies in Gwinnett County in March of 2009, Officer McCollough obtained information from witness statements that a vehicle involved in the robberies was a silver green Taurus, Sable, or Jaguar, with a "La Raza" bumper sticker.  T. at 182-83.

2

3.    On or about April 24, 2009, Officer McCollough was investigating a robbery at an Exxon Station on Lawrenceville Highway and reviewed surveillance video which showed a white heavy-set female driving a vehicle with a "La Raza" sticker on the bumper.  T. at 185.

4.    The clerk at the Exxon station said that three people came in, one carrying an AK-47, and the others carrying pistols.  T. at 185.

5.    Shortly after the robbery at the Exxon station, a robbery took place at a Texaco station at 7066 Buford Highway.  T. at 185.

6.    Witness at the robbery of the Texaco station stated that a white female had been driving the vehicle, and that a black male and two Hispanic males had come into the store, one of whom carried an AK-47 or a machine gun.  T. at 185.

7.    Within approximately 20 minutes after the robbery occurred at the Texaco station on April 24, 2009, Officer Bessette encountered a vehicle that matched the description given by the witnesses.  T. at 185-86.

8.    Officer Bessette followed the vehicle into Sinclair Apartments on Old Norcross Tucker Road and turned on his blue lights.  T. at 186.

9.      Officer Bessette observed a passenger get out of the vehicle on the left rear side
        and reach into a bag, and Officer Bessette fired at him, but missed, and the man
        took off running.  T. at 186.

10.     The vehicle that Officer Bessette stopped was a light green Mercury Sable.  T.
        at 187.

11.     At some point, Officer McCollough arrived on the scene, and discovered that
        Defendant, who was identified to Officer McCollough by one of the other
        officers as Roberto Salazar, was already in handcuffs.  T. at 189.

12.     Officer McCollough told Defendant that he was going to be transported to
        headquarters so that Officer McCollough could talk to him.  T. at 188.

13.     Officer McCollough presumed that Defendant had already been advised that he
        was under arrest for robbery, but Officer McCollough does not know
        specifically what the other officers on the scene said to Defendant because he
        was already in handcuffs when Officer McCollough arrived.  T. at 190-91.

14.     Defendant was transported back to headquarters in a patrol car.  T. at 188.

15.     Officer McCollough intended to make a video recording of his interview with
        Defendant, but the recording became corrupted at some point, and the only part
        of the interview that was recorded was the first three minutes after Defendant
        was brought into the room.  T. at 189-90.

16.     When Officer McCollough conducted the interview, he believed it was being
        recorded.  T. at 189.

17.     Detective Crosby may also have participated in the interview with Defendant.
        T. at 199.

18.     When Officer McCollough began his interview of Defendant at the GCPD
        headquarters, station, Officer McCollough advised Defendant of his Miranda
        rights from a card that Officer McCollough keeps in his wallet.  T. at 194.

19.     Officer McCollough testified that he read the Miranda warnings to Defendant
        as follows, using the card he carries in his wallet: "You have the right to remain
        silent.  Anything you say can and will be used against you in a court of law.
        You have the right to talk to a lawyer and have him present with you while you
        are being questioned.  If you cannot afford to hire a lawyer, one will be
        appointed to represent you before any questioning, if you wish.  You can decide

at any time to exercise these rights and not answer any questions or make any statements." T. at 194-95.

20.     According to Officer McCollough, Defendant stated that he understood his rights, and "[h]e asked me if I could get him a lawyer to come over and talk to him." T. at 195.

21.     In response, Officer McCollough told Defendant that he, Officer McCollough, did not get lawyers personally to come talk to people, but that once Defendant was arrested, and he was booked in county jail, he would receive a court-appointed attorney. T. at 195.

22.     According to Officer McCollough, Defendant never said "I want to speak to an attorney." T. at 202.

23.     According to Officer McCollough, Defendant "asked me kind of like in an inquisitive manner, "can you get me an attorney?' If that is something I did, you know. And I answered the question. But he never actually said I want to specifically speak to an attorney." T. at 202.

24.    Officer McCollough testified that, on the basis of Defendant's question to him, he knew that Defendant wanted an attorney.  T. at 202-03.

25.    After Officer McCollough told Defendant that he would receive a court-appointed attorney after he was arrested and taken to the county jail, Defendant looked at Officer McCollough for a minute and then said, "Well, what would you have done?"  T. at 196.

26.    Officer McCollough responded, "What do you mean what would I have done?"  T. at 196.

27.    Defendant then told Officer McCollough that his mother and his sister were being held by MS 13 in El Salvador, and "they demanded that they send them money weekly or they would be killed."  T. at 196, 197-98.

28.    Officer McCollough told Defendant that there was nothing he could do about that.  T. at 196.

29.    Defendant again asked Officer McCollough what he would have done, and Officer McCollough told Defendant that he would get a job.  T. at 198.

30.     Defendant responded that he had a job, but that he only made $300 a week, and they wanted a thousand dollars a week.  T. at 198.

31.     Defendant identified the individuals in the surveillance photos from the robberies as himself, Francisco Landaverde and Alden Espana.  T. at 198.

32.     Defendant told Officer McCollough that he was always the first one in carrying a pistol, and identified himself in a photo as the person in a striped jacket pointing a silver .22 caliber pistol at the clerk.  T. at 198-99.

33.     Defendant also told Officer McCollough about the locations of the robberies that they had committed in both March and April.  T. at 200.

34.     Officer McCollough conducted the interview with Defendant in English, and Defendant appeared to understand English.  T. at 196.

35.     Defendant did not request a Spanish-speaking officer to assist in the interview. T. at 196.

36.     When Detective Crosby participated in the interview at the beginning, he also spoke in English to Defendant.  T. at 197.

37.     Defendant did not appear to Officer McCollough to be under the influence of any drugs or alcohol during the interview.  T. at 196.

38.     Officer McCollough's interview of Defendant lasted approximately an hour and a half.  T. at 204.

## DISCUSSION

I.      Defendant's Motion to Suppress Evidence

Defendant initially filed a Motion to Suppress Evidence [47] in which he argued that the Court should suppress all items seized during a search of his vehicle and his person on or about April 24, 2009.  In the Post-Hearing brief in support of his Motion to Suppress Evidence and Motion to Dismiss [84] filed on March 29, 2010, Defendant titles his brief "Post Hearing Brief Regarding Illegally Obtained Statement."  In that Post-Hearing Brief, Defendant does not address any of the issues raised in his Motion to Suppress Evidence [47] regarding the suppression of any items seized during a search that occurred on April 24, 2009, or on any other date.  Furthermore, although the Government noted in its Response Brief [92] that Defendant has appeared to abandon his Motion to Suppress Evidence and that the Government thus considers the

9

motion withdrawn, the Defendant failed to file any reply brief and thus failed to respond to the Government's argument.

Accordingly, the undersigned deems the Motion to Suppress Evidence [47] to have been abandoned by the Defendant, and **RECOMMENDS** that Defendant's Motion to Suppress Evidence [47] be **DENIED**.

II.      Defendant's Motion to Suppress Statements

Defendant has moved to suppress all statements made by him on or about April 24, 2009, during the interview by Officer McCollough.  Defendant argues that his statements were taken in violation of Edwards v. Arizona, 451 U.S. 477 (1981), because he clearly and unequivocally asked for counsel.  The undersigned agrees and finds that Defendant made a clear request for counsel, but Officer McCollough continued to interrogate him after his request for counsel.

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court established that a suspect being interrogated in a custodial setting has a Fifth Amendment due process right to have counsel present.  The Court also held, however, that a suspect could waive his right to have counsel present and that his statements could be used against him if the prosecution could establish that the suspect

10

"knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 475.

Subsequently, in Edwards v. Arizona, 451 U.S. 477 (1981), the Court reaffirmed its holding that a suspect may waive his Miranda rights but observed that:

> [A]dditional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.  We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

Edwards, 451 U.S. at 484-485 (footnote omitted).  Thus, Edwards created a bright line rule that "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." Davis v. United States, 512 U.S. 452, 454 (1994).

Finally, it has been established that, if a suspect makes a clear and unequivocal request for counsel, "an accused's postrequest responses to further interrogation may

not be used to cast doubt on the clarity of his initial request for counsel." <u>Smith  v.</u> <u>Illinois</u>, 469 U.S. 91, 92 (1984).

Thus, the question before the court on the <u>Edwards</u> issue is whether Defendant's question to Officer McCollough–asking if Officer McCollough could get him an attorney to come talk to him–was an unambiguous invocation of his right to counsel. Based on existing precedent and the prophylactic intent of the bright-line <u>Edwards</u> rule, the undersigned finds that Defendant made an unambiguous request for counsel at the onset of the interview in question and Officer McCollough did not immediately stop questioning him, as required by <u>Edwards</u>.  To the contrary, after just having advised Defendant that he had a right to an attorney while he was being questioned, when Defendant asked the officer to get him an attorney, Officer McCollough advised him that he could not get an attorney until he was formally arrested and booked in the county jail.  <u>See</u> T. at 194-95.

Thus, because Defendant's request for an attorney was unambiguous, all of Defendant's statements after his request for an attorney must be suppressed.  If Defendant had said, for example, "Can you get me a glass of water?" the clear and unambiguous meaning would be that Defendant wanted a glass of water and was asking for a glass of water.  Officer McCollough, however, did not interpret

Defendant's request to be a request for an attorney.  Officer McCollough testified that, when Defendant asked "Can you get me a lawyer?" Defendant was really asking if Officer McCollough was able to *personally* go and obtain a lawyer for Defendant at that minute, and Officer McCollough informed Defendant that, no, he could not get a lawyer for Defendant at that time but after Defendant was brought to the county jail and arrested, he could obtain a court-appointed lawyer.

The Government argues at length that the Defendant's question "can you get me an attorney?" was really more of a question about *how* he could get an attorney, or a question asking about the *process* of obtaining an attorney.  The Court rejects this argument.  Defendant did not ask "what do I have to do to get an attorney?" or "what is the procedure for getting an attorney?".  Instead, immediately after being advised of his right to an attorney, he asked, "can you get me an attorney?".  Again, if Defendant had asked "can you get me a glass of water?" the only reasonable and obvious interpretation would be that Defendant was asking for a glass of water. The Government, however, would have the Court believe that, no, what Defendant was really asking was how he might go about obtaining a glass of water if he decided he wanted one in the future, that he was asking about the *process* of obtaining a glass of

water.  The undersigned finds that the Government's interpretation is not a reasonable interpretation of the simple question "can you get me an attorney?".

Although Officer McCollough interpreted Defendant's request for a lawyer as asking if Officer McCollough could personally get him an attorney, he also testified that he knew that Defendant wanted an attorney to "come and talk with him."  T. at 208-09 ("He asked me if I could get him one [an attorney] to come talk to him.").  Officer McCollough also testified that he understood that Defendant was asking for a lawyer.  T. at 202-03.

> The Court: What did you understand him to mean when he said, can you get me an attorney?  Do you think he wanted an attorney?
>
> A: What I was understanding is, could I go get him an attorney.
>
> The Court: What do you think he wanted?  Do you think he wanted an attorney?
>
> A: I thought he wanted to know, you know, basically could I go get him an attorney.  Maybe he wanted an attorney at that point in time, but he wanted to know if I could go get him one.  I told him I couldn't go get him one, I told him how.
>
> The Court: So you understood he was asking two things, could you get him an answer?  My question is, from that, from my understanding, **did you know he wanted an attorney?**
>
> A: **I guess so, your honor.**

14

T. at 202-03.  Thus, Officer McCollough conceded to the Court that he knew that Defendant wanted an attorney.  In its brief, the Government also concedes that "Defendant's question could also be interpreted as a present request for an attorney in dealing with his interview."  Gov. Br. [92] at 22.

Miranda provides substantial guidance as to how clear a request for counsel must be to require the cessation of interrogation.  There the Court stated that if a suspect "**indicates in any manner** and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Miranda v. Arizona, 384 U.S. 436, 444 (1966) (emphasis added).  At the outset of his April 24, 2009 interview, immediately after Officer McCollough had advised him of his Miranda rights, including his right to counsel, Defendant asked Officer McCollough "can you get me an attorney?"; such question clearly "indicates in any manner" that Defendant wanted to consult with an attorney, and thus meets the Miranda requirement for when the interrogation must cease.

Further guidance may be found in McNeil v. Wisconsin, 501 U. S. 171 (1991), in which the Supreme Court explained that an unambiguous request for counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." McNeil, 501 U.S. at 178.  In

Davis v. United States, 512 U.S. 452 (1994), the Supreme Court further illuminates the relevant test holding that, while a suspect need not "'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459 (citation omitted). "Can you get me an attorney?" meets the low bar set in McNeil and Davis. When, as in this case, immediately after being advised of his Miranda rights and being told that he had the right to have an attorney with him during questioning, a defendant asks for an attorney, that request can, and should, be "reasonably construed as an expression of a desire for the assistance of an attorney," and "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." McNeil, 501 U.S. at 178; Davis, 512 U.S. at 459.

In addition, Defendant's request for a lawyer in this case appears more in line with statements in other cases held to be clear and unambiguous requests for counsel than it does with statements found to be ambiguous requests for counsel. Compare United States v. Lee, 413 F. 3d 622, 626 (7th Cir. 2005) ("can I have a lawyer" and "could I get a lawyer" held unambiguous requests for counsel), with Davis, 512 U.S. at 462 ("maybe I should talk to a lawyer" held ambiguous, and therefore not a request

16

for counsel).  It is hard to see much of a difference, if any, between "could I get a lawyer" and "can you get me a lawyer."  Both requests imply a present desire to obtain counsel, while in cases where requests have been deemed ambiguous the present desire for counsel is not expressed (e.g., "*maybe* I should talk to a lawyer").

The issue of whether Defendant made a clear and unambiguous request for counsel must be determined in light of the totality of the circumstances.  Thus, a defendant's questioning the need to speak to a particular counsel at the commencement of an interrogation has been deemed an unambiguous request for counsel, while questioning the need to speak to counsel after an hour and a half of interrogation has been found an ambiguous statement allowing the police to seek to clarify that the defendant did not want a lawyer, and then to continue to interrogate. Compare Abela v. Martin, 380 F. 3d 915 (6th Cir. 2004) (*at the outset of questioning* Defendant said, "maybe I should talk to an attorney by the name of William Evans," and gave Evans' card to the police officer; the court held that it was an unambiguous assertion of right to counsel) (emphasis added), with Davis, 512 U.S. at 455, 462 (defendant made the statement *90 minutes into interview* that "*maybe* I should talk to a lawyer"; the court held that the request was ambiguous) (emphasis added).

Furthermore, once a defendant asks for an attorney, the police must stop the interrogation immediately "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-485.  In the instant action, after the Defendant asked Officer McCollough for an attorney, and Officer McCollough responded that *he* (Officer McCollough) could not get the Defendant an attorney, but that Defendant might be able to get one later after he was taken to the county jail, Officer McCollough did not stop questioning Defendant but sat across the table from him, apparently in silence "for a minute" or so.  According to Officer McCollough, after he told Defendant that he would be able to receive a court-appointed attorney after he was arrested and taken to the county jail, Defendant looked at Officer McCollough "for a minute" and then said, "Well, what would you have done?"  T. at 196.  Officer McCollough responded, "What do you mean what would I have done?"  T. at 196.  In light of the totality of the circumstances, the undersigned finds that Officer McCollough did not cease the interrogation as he required to do, but essentially told Defendant that he could not have a lawyer at that time, and then continued to interrogate the Defendant.

As the Supreme Court has explained in McNeil v. Wisconsin, 501 U. S. 171 (1991):

>Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him' – which means, we have most recently held, that counsel must be present.  If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.  This is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights," Michigan v. Harvey, 494 U.S. 344, 350 (1990) (citations omitted).

McNeil, 501 U.S. at 177.

In the instant action, Defendant's request for a lawyer "to come and talk to him" manifested a present desire for counsel at the outset of his interview and it was sufficiently clear that a reasonable police officer would consider the statement a request for counsel.  Once that desire had been expressed, the interrogating officer could not ignore it, as was done here, and continue on, implying that Defendant's desire to talk to a lawyer could be addressed later, after the interrogation was over and the Defendant was taken to the county jail for booking.  Under Davis, the statement either meets the requisite level of clarity or it does not.   Since clarification is not permitted (unless the suspect's request cannot be reasonably understood as a request for counsel), for the bright-line Edwards rule to fulfill its prophylactic purpose  all

doubt must be resolved in favor of finding a Defendant's reference to getting a lawyer to be an unambiguous request for counsel.

Similarly, we must recognize the dilemma that Officer McCollough faced when Defendant asked for a lawyer. All officers in that situation know that, if they interpret the question as a request for counsel, the interview is over and the opportunity to get a statement from the suspect will probably be lost. On the other hand, they do not have the time to parse through the cases discussed herein and reach an informed judgment as to whether or not a request for a lawyer is an unambiguous invocation of a Fifth Amendment right. Accordingly, they lose nothing by proceeding and taking their chances later that a court will find the mention of counsel ambiguous. But Fifth Amendment violations should be not something to be addressed only in suppression hearings. They should be avoided, and, in light of the reality faced by police officers investigating a case, that means there should not only be a bright-line rule requiring the cessation of all questioning once the right to counsel is invoked, as established by Edwards, but that the line should be as broad as it is bright so that if a statement could, in any way, be construed as a present desire to seek counsel then all questioning must stop.

> Doubts must be resolved in favor of protecting the constitutional claim. This settled approach to questions of waiver requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel–we presume that the defendant requests the lawyer's services at every critical stage of the prosecution.

Michigan v. Jackson, 475 U.S. 625, 633 (1986), *overruled on other grounds by* Montejo v. Louisiana, 129 S. Ct. 2079 (2009).

The undersigned further notes that, in a separate case, a defendant moved to suppress statements on the ground that he was interrogated after he made a request for counsel, and the undersigned also recommended that the motion to suppress be granted.  See United States v. Richardson, Criminal Action No. 1:08-CR-139-CC-CCH, N. D. Ga (Report and Recommendation [213] dated January 4, 2010).  In that case, however, Judge Cooper rejected that portion of the Report and Recommendation in which the undersigned recommended suppressing the defendant's statements; he concluded that the request for counsel in that case was ambiguous because it was subject to two different reasonable interpretations.  See United States v. Richardson, Criminal Action No. 1:08-CR-139-CC-CCH, N. D. Ga (Order [262] dated April 15, 2010 at 10-14).  In this case, however, immediately after being told that he had a right to an attorney when being questioned, Defendant asked "can you get me an attorney?"

and his request for counsel was far more direct and less ambiguous than the request for counsel in the <u>Richardson</u> case.

Because the undersigned finds that Defendant made an unambiguous request for counsel but was told he could not have counsel at that time, and that the interview was not concluded but instead, Defendant was held in silence before he asked "what would you do," **IT IS RECOMMENDED** that Defendant's Motion to Suppress Statements [45] be **GRANTED**.

## <u>RECOMMENDATION</u>

For all the above reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [45] be **GRANTED** and Defendant's Motion to Suppress Evidence [47] be **DENIED**.

IT IS SO RECOMMENDED this 18th day of June, 2010.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE